Mr. Chief Justice Marshall
 

 delivered the opinion of the Court.
 

 • • , Inis is an appeal from a decree of the Circuit Court for the District of Kentucky, dismissing a bill brought by the appellant, against the' heirs of Michael Gratz for the specific performance of a contract.
 

 Michael Gratz, who resided in Philadelphia, had purchased from John Craig, of Kentucky, a tract of land containing, by the survey, one thousand acres, for which no patent had then issued. Subsequent to this purchase, the patent issued in the name of Craig, who sold a part of the land to Keyser, and a suit had been brought in the federal Court of Kentucky by Gratz, against Craig and Keyser, to compel a conveyance of the land. Michael Gratz had, in the mean time, sold eight hundred and twenty-four acres, part of this tract, to Robert Barr.
 

 While the suit against Craig and Kéyser was depending, Walter Brashier, the plaintiff, who resides in Kentucky, came to Philadelphia on business, and on the 2d day of March, in the year 1807, purchased the residue of the land from Gratz. Brashier had married the daughter of Robert Barr.
 

 The residue of the land was estimated by the parties at 302 acres, for which Brashier agreed to give the sum of $6795 in his negotiable notes, payable in six, twelve, and eighteen months. From this sum was, however, deducted $250, “ allowed to the said Walter Brashier, towards the costs and expenses of prosecuting the suits now depending, for the recovery of the lands hereby contracted for, vvhich is ac
 
 *530
 
 cepted by the said Walter, as a full satisfaction for all costs, trouble and expense which he may be at, in prosecuting the said suits, and which he hereby agrees and undertakes to manage at his own' costs and expense. And it is hereby agreed that a correct and accurate survey shall be made, at the expense of the said Michael, of all the said-residue of the above-mentioned tract of land, lying within the limits of the original survey thereof, not sold to the said Robert Barr ; and if, upon such survey, it shall be found, that the said residue doth not contain the quantity of 302 acres, then, for every one deficient, the said Michael Gratz, his heirs,.executors, or administrators, shall pay or állow to the said Walter Brashier, his executors, administrators
 
 or
 
 assigns, the sum of twenty-two dollars and a half; and if any part of the said residue shall be lost, in all, or any of the said suits now depending, or that maybe instituted hereafter, for any part of the said residue, the said Michael Gratz, his heirs,-executors or administrators, shall only be liable to refund to him, the said Walter Bra-shier, his executors, administrators or assigns, the sum of 11 dollars 25 cents, for each and every acre so lost. . It being hereby declared, that the said Walter Brashier has purchased the title of the said Michael Gratz, at his own risk and hazard, and so that he shall have no recourse against the said Michael Gratz, for want of, or for any defect in the title to the said residue, or any part thereof, save only the price of 11 dollars 25 cénts per acre, for every acre which shall be lost as aforesaid. And the said M. G. for himself, his heirs, executors, and administra
 
 *531
 
 tors, doth covenant and agree, that he or they shall and will, at any time after payment of the notes aforesaid, when thereunto required, by a good and sufficient deed, conveyance, or assurance in the law, convey and assure unto the use of him, the said Walter Bra-shier, his heirs and assigns forever, all. his, the said Michael Gratz’s estate, right, title and interest, of and in all the said residue of the above mentioned tract of land.
 

 Mr. Brashier executed his notes in conformity with this , contract, and returned to Kentucky, where he requested his brother-in-law, Thomas T. Barr, to attend to the prosecution of the suits then depending. Mr. Barr resided near the place where the Court was held, and Mr. Brashier at the distance of sixty or seventy miles. Mr. Barr immediately employed Mr. Bledsoe, a lawyer of eminence, to assist Mr. Hughes, who had been engaged by Mr. Gratz, and some time afterwards spoke to Mr. Wickliffe, but did not pay him a feé. No progress, however, seems to have been made in these suits, and the plaintiff failed to pay the fees of'the officers of the Court, which were demanded and received from Michael Gratz, in the year 1811, and afterwards froto his representatives.
 

 The notes for the purchase money were protested for non-payment, and have not been paid.
 

 In 1811, Mr. Brashier came to Philadelphia, when Gratz offered to'Convey "theland on his paying his notes. Mr. Brashier being unable to pay them, Gratz offered to rescind the contract, which Bra-shier declining to do, the question was referred
 
 *532
 
 to arbitrators, who were of opinion, that the contract was still binding. About this time, Brashier, who had been for some time much embarrassed,.appears to have become notoriously insolvent. In the autumn of 1811, Gratz departed this life., and in July, 1812, his heirs again offered to convey, on payment of the notes which Brashier had given for the purchase money. Payment not being made, the heirs of Gratz took the management of the suits again into their own hands, which were prosecuted with vigour, and in .1813, were finally determined by a decree in their favour. About this time the land rose suddenly to about 80 or 100 dollars per acre. After the decision of the cause, and after, this rise in the value of the land, Brashier, in November, 1813, entered into an agreement with Lewis Saunders, by which he was to convey, to Saunders half the land purchased of Gratz, in consideration Of Saunders paying, or tendering to the heirs of Gratz, the full amount of the notes he had given for the purchase. Saunders immediately offered his contract to the heirs of Gratz, and requested them, if ihey were willing to take it, and to indemnify him, to acknowledge a tender of the money, which the contract bound him to tender. They avowed their opinion, that, the contract of Michael Gratz with Brashier was of no validity, but consented to take the contract with Saunders, and acknowledged the tender. When in possession of this acknowledgment, Bra-shier instituted his suit in the Court of Kentucky for a specific performance of the contract of the 2d of March, .1807. The defendants removed this suit
 
 *533
 
 into the Circuit Court 01 the United States, where they filed their answer, insisting,: that the Court ought not to decree a specific performance, because the plaintiff had totally failed to perform his' part of the contract until there was `such a change of circumstances as materially ~o; afi~ect the rights of the parties. The Circuit Court dismissed the bill, and from that, decree the plahitiff has appealed to this Court.
 

 Limitations of the general rule that time is not ~sf the eSsenc6 of the contract.
 

 The appellant insists, that in equity, time is not of' the essence ~f the contract; that it is in part performed; and that his faiiure to pay the purchase money until December, 1813,- when the tender was made, is justified by the circumstances of tue case.
 

 The rule, that time is ~ot of the essence of a contract, has~ certainly been rec~gnized in Courts of equity; and there can be no doubt, that afailure on the part of a pur~haser Ot vendor, tO perform his contract on the stipulated day, äoes not, of itself; deprive him of his right to demand a specific performance ata subsequent day, when he shall be. able to comply with his part of the engagement. It may be in the power of the Court to direct compensation for the breach olcOntract in point if'time, and insuch case the object of the parties is e~'ectuated `by carry-, ing it into exeôution. But the rule is not uiiiversal. Circumstances may. be so ~hanged; that the object of the party can be no longe~ accomplished, that he who is injured by the failure of the other contracting party, cannot be placed. in the situation in which' he would have stood had the contract beei~ performed. Uuder such circumstances, it woi~Id be iniquitous to
 
 *534
 
 decree a specific performance, and a Court of equity will leave the parties to their remedy at law..
 

 It is true, that he whp has been ready to perform, may at any time file his bill in Chancery, requiring the other party to perform his contract or to rescind itand the Court will rescind the contract if he who has failed cannot, or will not, perform it. But this is not always necessary, and would not be always an adequate remedy.
 

 If, then, a bill for a specific performance be brought by a party who is himself in fault, the Court will consider all the circumstances of the case, and decree according to those circumstances.
 

 A consideration always entitled to great weight, is, that the contract, though not fully executed, has been in part performed. The plaintiff claims the benefit of this principle,, and alleges, that by prosecuting and managing, at his own expense, the suits depending in Kentucky, he has perforated that part of the agreement.
 

 If this allegation be supported by the fact, it will undoubtedly have great influence in the decision of the cause.
 

 The evidence iSj that the plaintiff, soon after his return to Kentucky, employed a gentleman of the bar, in addition to the counsel previously engaged by Mr. Gratz, and paid him his fee. It is also in evidence, that finding the business did not advance, he spoke to other counsel ; but his application was not accompanied with a fee, and was not much regarded. It appears that a survey was necessary, and that the deposition of a Mr. William Morton was indispensa
 
 *535
 
 ble to the successful termination of the cause. Yet the survey .was not made, and the deposition of Mr. Morton, though its importance bad been communicated to Brashier, was not taken. The fees to the officers of the Court were not paid, and Mr. Gratz was required to pay them. From March, 1807, when the contract was made, to the autumn of 1811, when Mr. Gratz died, the suit did not advance. The clerk informs us, that during this time, no other step was taken in' the cause than to move for leave to amend the bill and to continue it. The embarrassment of Mr. Brashier’s affairs, and his insolvency, added to this experience of his neglect of the cause, were but little calculated to inspire confidence in its future progress, or in his future attention to it. In 1812, the, heirs of Mr. Gratz took the management of the business into their own hands. The deposition of Mr* Morton was taken, the survey was made, and, in 1813, a decree was obtained in their favour.
 

 We think this cannot be considered as such a performance of his undertaking, “ to manage the suits at his own expense,” as to entitle him to call on the vendor for an execution of the contract.
 

 It has also been contended, that by the agreement between the parties, Mr. Gratz was bound to survey the land, and that this was á preliminary step to be taken by him before he could justly require Mr. Bra-shier to pay his notes for the purchase money.
 

 Although this could not, at law, be pleaded to notes importing an absolute promise to pay money, it will readily be admitted, that if the understanding of the parties had been, that Mr. Gratz should make
 
 *536
 
 the survey, and that it should precede the payment of the notes, such understanding would account for the non-payment of the notes, and would, place the demand for a specific performance of the contract on very strong ground..
 

 But the agreement does not indicate the expectation, that Mr. Gratz should make the survey, although the expense of it would be chargeable to him, and as it might be of advantage to Mr. Brashier, and could be of none to Mr. Gratz, as Mr. Brashier was a resident of Kentucky, and Mr. Gratz of Philadelphia, the expectation was not unreasonable, that Mr. Brashier would cause it to be made. He might be expected to move in this business, and to require Mr. Gratz to attend to it. His not having done so, is a proof that he did not suppose the survey to be of any consequence, because he did not intend to pay so much of the purchase money as the survey would show he ought to pay.
 

 But the articles of agreement, far from showing that the survey was to precede the payment of the notes, contain expressions indicating the intention, that their payment was not to depend on the survey. The parties stipulate, that for every acre which the survey shall show the tract to contain less than 302 acres, Gratz “ shall pay or allow” to Brashier the sum of 22 dollars 50 cents. That is, shall “ pay” him if the notes shall have been received, shall “ allow” to him if the deficiency shall appear before payment of the notes.
 

 Had Mr. Brashier been able and willing to pay his notes as they became due, he had sufficient mo-
 
 *537
 
 tires for surveying the land. He had
 
 reason to
 
 believe* that there would be a deficiency. On his return from Philadelphia, in 1807, Mr. Barr, who lived upon the land, and was acquainted with its boundaries, told him that there could not possibly be the quantity he had purchased. He knew, too, that the land had been actually surveyed in October, 1807, by a son of Mr. Gratz, and had reason to believe, that this survey must have disclosed a deficiency. His omission, to make any inquiries of Mr. Gratz, or to make a survey, or to demand one, show that his conduct respecting his
 
 notes
 
 did
 
 not
 
 depend on a survey.
 

 We do not think, then, that Mr. Brashier is justified-in withholding the payment of the purchase money by the fact that the quantity of land was not ascertained ; nor does the evidence support the opinion that this fact had any influence on his conducts
 

 The plaintiff also attempts to justify the non-payment of the purchase money by the inability of Mr. Gratz to make him a title. But this excuse entirely fails him. He knew perfectly the state of the title, and the articles of agreement show that he knew it. They expressly declare that “ the said Walter Bra-shier has purchased the title of the said Michael Gratz, at his own risk and hazardand that if any part of the land be lost, the said Michael “ shall only be liable to
 
 refund
 
 to him the sum of 11 dollars 25 cents for each acre that may be lost/’ The contract states that suits werfe depending for '.he land, which suits Brashier undertook to manage and all the testimony in the cause shows that he knew-those
 
 *538
 
 suits were brought for the legal title. With this.full knowledge, he purchases the title of Gratz,, and. stipulates, that, after the payment of the purchase.money, Gratz shall convey,..not the land, or a good and sure title to it, but “ all his the said Michael, Gratz’ estate, right, title and interest,, of and m ail the said residue of the aboye mentioned tract ,of land.”.
 

 It is then an essential ingredient in this contract,, that .the purchase money shall be paid without whiting forthe termination of the cause. Brashier takes the whole. risk upon himself, except as to half the price of every acre which may be lost; and he is hot to retain even that portion of the purchase ; but, it is to be “ refunded.” to.him whenever the loss shall take place. He.had then-no. right to withhold the payment, of the purchase money ..until the suits should be determined; and any attempt to do so was a violation of the letter and the spirit of. his contract. The state of the title furnishes no sort of apology for this violation. Gratz was able to make, the conveyance which he had contracted to make, and which Brashier had contracted to receive ; and his want of the legal title furnished no excuse for the non-payment of the purchase money.
 

 The situation of the parties, and the circumstances in which the property was placed, deserve serious consideration. The contract was made while a suit for the title was depending, and there is reason to suppose that this circumstance had some influence on the price of the article. We perceive that if any part/of the land should be lost, one half the purchase
 
 *539
 
 money should be lost by Brashier. While the suits were depending, and the purchase money unpaid, Brashier became insolvent. Consequently, should the land be recovered, it would be the property of Brashier at the stipulated price; should it be lost, Brashier could not pay that portion of the price which he was to pay in the event of loss. Under such circumstances, had a suit, in chancery been brought to have the contract rescinded, unless he would pay the purchase money, no Court could have hesitated to decr.ee according to the prayer of the bill. No Court could allow one party to hold the other bound, while the obligation 1 was not reciprocal ; or to hold himself prepared to avail himsélf of all favourable contingencies, without being affected by those which were unfavourable..
 

 ■ Mr. Brashier, then, if he did not execute his part of the contract with punctuality, ought to have executed it before a great change of circumstances took place ; before the doubts which hung over the title, and under which he had purchased, were dissipated. That he did not do so, and was unable to do so, that in the event of an unfavourable termination of the suits he would be totally unable to comply with his contract, weakens very much the claim to a specific performance, which he sets up after the removal of the difficulties which attended the title.
 

 Another circumstance which ought to have great weight, is the change in the value of the land. It was purchased at 22 dollars SO cents per acre. Mr. Brashier failed to comply, and was unable to comply with his,engagements. More than five years
 
 *540
 
 after the last payment had become due, the .land, suddenly rises to the. .price ®f 80 dollars per acre. Then he tenders the. purchase money, and demands a specific. performance. Had the land.fallen in value, he could, not have paid the purchase money. This total want, of reciprocity gives increased influence to the objections to a specific performance, which are .furnished by this great alteration in the value of the articled
 

 Both parties have sought to avail themselves of the transaction with. Mr. Saunders, by whom the purchase money was tendered in Dec. 1813. The defendants say that Brashier was still unable to comply with his contract, and that the tender was made in consequence of an arrangement by which Saunders was to advance the whole purchase money, and to receive half the land. But it was unimportant to them, whose money was tendered, or how it was obtained. Of this circumstance, therefore, they cannot avail themselves.
 

 The plaintiff insists that the contract between the defendants and Saunders was a fraud on him, because he had a right to consider Saunders as his friend and agent. But the . tender of the purchase money was the only service he was to expect from Saunders, and this service has been performed. He is precisely in the same situation as if the contract between Saunders and the defendants had never been made.
 

 It has been also contended, that the concealment of the survey made by Joseph Gratz, in October, 1807, and the demand of the whole amount of his
 
 *541
 
 notes,, after a knowledge of the deficiency in the quantity of land, were fraudulent on the part of the defendants.
 

 Mr. Brashier knew that the survey had been made, and had reason to believe that it disclosed a deficiency in the quantity of land. He has sustained no injury by tne omission to make a.full communication to him. It is certainly true, that after the knowledge of this deficiency, Mr. Gratz in his lifetime, and his heirs since his decease, ought not to have demanded, the full amount of his notes. The Court, therefore,. allows them no advantage from their, repeated offers to convey,, on receiving the whole amount of the notes ; but considers the case as if no such offers had ever been made..
 

 This then, is a demand for a specific performance, after a considerable lapse of time, made by a person who has. failed, totally to perform his part of the contract;, and it is made after a great change, both in the title, and in the value, of that which was the subject of the contract; and by a person who could not have been, compelled to execute his part of it, had circumstances taken an unfavourable direction.
 

 In such a case, we are of opinion, that a Court of ^equity ought to leave the parties to their remedy at law.
 

 Decree affirmed.