MUNDY and others *v.* DAVIS.[1]

*(Circuit Court, D. Kentucky.* April 1, 1884.)

CONTRACT—CONSTRUCTION OF.

A holding less stock than B. in a railroad corporation, they agree, in order to equalize their respective holdings, that the stock held by them shall be common property, and that A. shall give his note to B. for the amount necessary to equalize the joint-stock account, the cost of the stock being computed as of the date of the contract. Three years afterwards B. renders an account of the cost of the stock, with interest to date, takes A.'s note at one year for the cost of enough stock to equalize their respective holdings, and gives a receipt for the note, reciting that "said note is given me for the purchase of 391½ shares * * * now held by me, and to be delivered, upon payment of his note," to A. Shortly before maturity of the note, A. is notified that, if it is not paid at maturity, his right to the stock will not be recognized. The note is not paid at maturity, and B. destroys it. Nearly six years after date of receipt, A 's assignee tenders to B. the amount due on note and demands stock. *Held,* that the title to stock did not vest in A., and that he did not pledge it to B. as security for payment of note, but that, by the terms of the receipt, B. retained the title until the purchase price should be paid; that the suit is for a specific performance of a contract, and not a bill to redeem; and that, by reason of the delay and changed condition of the parties and of the value of stock, specific performance must be denied.

In Equity.

*Wm. Lindsay,* for complainants.

*A. P. Humphrey* and *St. John Boyle,* for defendant.

BARR, J. Prior to November, 1873, Charles G. Davison and Alexander H. Davis were largely interested in the Louisville City

[1] Reported by Geo. Du Relle, Asst. U. S. Atty.

Street Railway, and on the tenth of November, 1873, they entered into a contract as follows:

"Memorandum of an agreement made this tenth day of November, 1873, between Charles G. Davison, of the city of Louisville, Kentucky, and Alexander Henry Davis, of the city of New York, of New York, witnessceth:

"Whereas, the said parties of the first and second part, respectively, are the actual and equitable owners of certain shares of the capital stock of the Louisville City Railway, the said Davison holding or being entitled to hold about eight hundred, and the said Davis holding or being equitably entitled to hold about twelve hundred, shares of the said stock; and whereas, the said parties of the first and second part are desirous of equalizing their respective interests as between themselves, and also of acquiring possession of a greater amount of the said stock: Now, therefore, it is hereby agreed that the stock now actually or equitably held by the parties of the first and second part, respectively, shall be regarded as common property, each party being entitled to the one-half ownership of said stock for the consideration hereinafter to be mentioned. It is also agreed that all purchases of the said stock that may be made hereafter shall be thus made for the joint account of the parties to this contract, and shall be likewise held by them in common. It is furthermore agreed, as the consideration for the equalization of their respective interests by the said parties to this contract, that the actual cost of the stock held by each party shall be computed as of this date, and a note given by the said Davison at any time, upon demand, for the amount which would be due from him for the equalization of said joint-stock account; it being understood that two hundred and fifteen (215) shares of said stock now held by the said second party shall offset in the account a like number of shares held by the said first party. And it is furthermore agreed that in case of the death of either of the parties to this contract, the survivor shall be entitled to purchase the stock of said deceased party within one year from the time of such decease at a price not exceeding twenty-five (25) dollars per share if within twelve months from the date of this agreement, with an advance of ten (10) dollars per share for each succeeding twelve months.

"In witness hereof, the parties of the first and second parts hereby attach their hands and seals this tenth day of November, 1873.

"Witness: E. H. SPOONER.            ALEX. HENRY DAVIS.
                                          "C. G. DAVISON."

Davison, who resided in Louisville, was the president of the railway, and Davis, who resided in New York, was its vice-president. These two seemed to have had a controlling interest in the stock, and the road continued under their general control until after November, 1876. On the eleventh of November, 1876, Davis rendered to Davison an account of their stock transactions, in which each party's stock is charged at its cost price, and interest added up to November 10, 1876. This statement shows that Davis then held 1,571 shares, and Davison 812 shares, the entire stock costing, with interest,—2,383 shares,—$52,404.10. One-half—1,191½—would cost $26,202.05. Davis' 1,571 shares, by this account, cost $32,723.41, being $6,521.36 more than one-half of the cost of the entire stock. Davison was entitled to 379½ shares of the stock which was in the name of Davis, and owed therefor the $6,521.36. Davison executed his note to Davis for this $6,521.36, payable one year after date, November 10, 1876,

bearin_ 7 per cent. interest, and Davis retained the stock, and executed a receipt in these words, viz.:

"SYRACUSE, N. Y., Jan. 29, 1877.

"Received of C. G. Davison his note, dated November 10, 1876, for $6,521.36, payable one year from date, with interest at 7 per cent. Said note is given me for the purchase of three hundred and seventy-nine and one-half shares of stock of the Louisville City Railway Company, now held by me, and to be delivered upon payment of his note, to said Davison.

"ALEX. HENRY DAVIS."

This receipt was delivered about the time of the delivery of the note. This note has not been paid, nor any demand of the stock or tender of the amount of the note made until after the transfer of Davison's claim, in September, 1882, to complainant Mundy. After this transfer, in January, 1883, Mundy tendered the amount due on the note and demanded the stock, which was refused by Davis. Mundy, with whom is united Davison, has brought this suit, and the depositions of both Davis and Davison have been taken.

The only material facts in addition to those already stated are that Davis testifies that, shortly before the maturity of the note, he wrote to Davison, saying he would not continue to recognize Davison's right to this stock after the maturity of the note, if it remained unpaid, and that he subsequently destroyed the note; that the market value of the stock did not materially advance until after 1878; and that since then, under the management of Davis, the market and intrinsic value has increased, and that, at the time of the demand by complainant of this stock, it was worth more than twice as much in the market as at the maturity of the note. Davison went out of the directory and presidency in February, 1878, and was succeeded by Davis, and, so far as the record shows, made no personal demand for the stock, or tender of the amount of the note, and has long since transferred his stock in the company for debt, and was unable to pay this note.

If this bill be for the purpose of having a specific performance of an agreement to deliver this stock upon the payment of the purchase money, it cannot be sustained, because of the long delay in making a tender of the purchase money, and the change in the value of the stock. It would be inequitable to allow Davison or his assignee to lie by more than five years after this money was due, and the stock was deliverable, and then obtain a specific performance when the relations of the parties have changed and the stock has greatly appreciated in value. *Brashier* v. *Gratz*, 6 Wheat. 530; *Benedict* v. *Lynch* 1 Johns. Ch. 375; *Alley* v. *Deschamps*, 13 Ves. 228; *Rogers* v. *Saunders*, 16 Me. 92. The learned counsel concedes this, but insists that at the time of the execution of the note, Davison was already the equitable owner of the 379½ shares of stock, and, being the owner, pledged the stock to Davis to secure the payment of the note, and that, as Davis has not taken the proper legal steps to divest Davison of his interest, the right of redemption still continues, notwithstand-

ing the lapse of time. The receipt which Davis gave, and Davison accepted, states that the note was executed for the purchase of the $379\frac{1}{2}$ shares of stock, and that it was to be delivered to Davison upon the payment of the note. It is true that the receipt does not state that the purchase was *then* made, but it does state that the stock was then held by Davis, and the fair construction of this receipt must be that the note was the purchase price of the stock owned by Davis and sold to Davison, and that he retained it for the price. The complainants insist that this receipt should be read with the agreement of November 10, 1873, and that that agreement invested Davison with the equitable ownership of one-half of the stock they (Davis and Davison) then owned, or might thereafter purchase, and that, although Davison was by the agreement to pay Davis the cost of the stock, with interest, which was necessary to equalize him with Davis, this obligation did not prevent the investing of the equitable ownership in Davison by force of that agreement, although it was not paid for. The agreement of November, 1873, states that—

"It is hereby agreed that the stock now actually or equitably held by the parties of the first and second part, respectively, shall be regarded as common property, each party being entitled to the one-half ownership of said stock for the consideration hereafter to be mentioned. It is also agreed that all purchases of said stock that may be made hereafter shall be thus made for the joint account of the parties to this contract, and shall be likewise held by them in common. It is furthermore agreed, as the consideration for the equalization of their respective interests by the said parties to this contract, that the actual cost of the stock held by each party shall be computed as of this date, and a note given by the said Davison, at any time, upon demand, for the amount which would be due from him for the equalization of said joint-stock account."

It is not clear, from the language of this agreement, whether the equalization of interest in the stock was to be by a joint holding, each having an undivided half of the whole, or by a separate holding of one-half by each party. The parties, however, construed the contract as meaning the separate holding of one-half by each party. But it is clear that Davison was to pay to Davis the average actual cost of the stock which was necessary to make him the owner of an equal number of shares with Davis. This sum, with interest from that date, would be the purchase price of the stock necessary to make the equalization, and although the number of shares could not have been accurately ascertained at the instant of the agreement, still, had there been a dividend thereafter declared on this stock, Davis would have had to account with Davison for it. This, however, would have been by the terms of the contract, and not by reason that the title was then in Davison. This contract did not distinctly provide whether the evidence of title should remain in Davis' possession, and the title in his name of the whole 1,200 shares, until the purchase price of the shares which Davison was to have to equalize him was paid, but both parties construed the agreement as meaning this, and that when

Davis thereafter purchased stock the certificates should be in his name I mean their conduct indicated such a construction. If, therefore, Davison had, on the tenth of November, 1876, tendered Davis his note for the cost of the 379½ shares of stock, with interest from November 10, 1883, and demanded an immediate transfer of the stock to him, I doubt if a court of equity should have decreed a specific performance of such a demand without the payment of the note for the purchase price. The contract was silent, but the conduct of the parties had been such as would have given Davis, in the absence of any express agreement, the right to retain the title to the stock until the purchase price was paid, and hence there would have been no occasion for Davison to have pledged this stock for the payment of the purchase price. The giving of this stock as security for the payment of its purchase price by Davison would have been an affirmative act, which would require the acceptance of Davis. It is clear this was not done, but instead Davis retained ("held") the stock as of right, and only agreed to deliver it when the purchase price was paid, and that Davison, by the acceptance of the receipt, admitted this was Davis' right. Davison did not pledge to Davis his (Davison's) stock for a debt for which it was not previously bound. On the contrary, Davis held the stock which he had sold to Davison for the purchase price, and agreed to deliver this stock when the purchase price was paid. The question is, therefore, whether a specific performance for the delivery of the stock upon the payment of the purchase price, as provided in the receipt of January 29, 1877, will now be decreed. This, for the reasons already given, should not be decreed.

The bill should be dismissed and the defendant have costs; and it is so ordered.