Mr. Justice Cox
delivered the opinion of the Court:
I am requested to deliver the opinion of the court in the case of Presbrey & Green against Effie H. Kline, whose maiden name was Ober. On the first of April, 1887, the defendant, by her agent, one Mrs. Baker, agreed to sell to the complainants a tract of land known as Cliffbourne, for the price of $110,000. The evidence of the agreement was con *517 tained in a receipt signed by Mrs. Baker, a receipt for $5,000 as a deposit on account of this purchase, the further sum of $xo,ooo to be paid within 30 days, on delivery of a good and sufficient deed, with perfect title, satisfactory to the Real Estate Title Insurance Company, to such person or persons as said Presbrey & Green shall designate; and the receipt then goes on to name the different installments to be paid, and further describes the application to be made of each payment, partly to the amount due the defendant and' partly to a prior incumbrance of $40,000. It also provides that if the title cannot be made to a certain fraction of an acre, there shall be an allowance made for the same, to be deducted from the purchase money. The concluding clause of this paper is, that if the Real Estate Title Insurance Company of the District of Columbia shall report the title imperfect, the $5,000 shall be returned to the said Presbrey & Green, otherwise to be forfeited if the terms of sale are not complied with’.
On the 30th of November, 1889, Presbrey and Green filed their bill for specific performance of this contract, and they allege that the complainants have been at all times ready and willing to perform all the conditions, of said contract which were to be performed by them, and to take said property and pay the agreed price therefor, according to the true intent and purpose of said agreement, but the defendant will not perform her part of the contract, but has refused and still refuses to deed the property to the complainants or either of them, or to perfect the title thereto, or to remove the imperfection in the title. It then goes on to allege that the defendant would not procure a perfect title to said premises, and further shows that the title was examined by the Real Estate Title Company, and mentions about a dozen supposed defects in the title, which remain to be cured, and alleges that by reason of these things the defendant has not fulfilled her agreement, whereby the complainants have been unable to secure or obtain a good and valid title to the said estate known as Cliff bourne, which is of great value, to wit: of the value of $250,000, as hereinbefore stated, and have therefore suffered great and irreparable injury.
*518 And they further say, that the said sum of $5,000 has not been returned to them, but they have been unjustly kept out of the same and deprived of the use of the same wrongfully, and which sum and interest thereon is a charge and lien upon the said premises known as Cliffbourne.
They then pray that the agreement entered into be specifically performed by the defendant, and that said defendant be decreed to convey by good and sufficient deed a good and valid title, free and discharged of all taxes, liens, and encumbrances to said title, excepting the trust of %40,000, and that she shall be required to pay the cost and charges incurred by the complainants; and they then ask as an alternative relief, if she cannot make a good title, that she be required to return to them the sum of $5,000 deposited, and as a further alternative relief, damages for the non-performance of her contract.
The defendant, in her answer, admits that Mrs. May Cole Baker signed the memorandum set out in the complainants’ bill.
She denies that she undertook to make a perfect title and denies that the title is imperfect, except as to the fraction of an acre, and goes on to say that the complainants undertook to have the title examined, and that they purposely neglected to have it reported upon, and formally refused to carrj»- out the alleged contract, abandoned all rights thereunder, surrendered possession of said property, and demanded the return of said $5,000.
She says that, pending this examination of title, the complainants placed said property in the hands of said Fitch, Fox & Brown for sale, and she believes and avers that, being without means to pay said $10,000 in cash, due July 1, 1887, and to meet the first note for $10,000, which if given would become due on December 1, 1887, together with interest for six months on $95,000, they expected that said real estate agents would make a sufficient number of sales of lots to warrant their entering upon the completion of said alleged contract of purchase, and to that end delayed report upon title to said property until, finding that the anticipated sales *519 were not made and they would be unable to make said cash payment, they concluded to abandon their enterprise, 'procured a report of alleged imperfections in said title from an employe of said title company, surrendered possession, and as above stated, demanded a return of said $5,000, and she says she has since arranged to sell to other parties.
She denies that complainants have, ever since the execution of said alleged agreement, been ready, willing and prepared at all times to complete the purchase on their part, and she denies the right of complainants, after abandoning said alleged contract and waiting two years, until said property has greatly enhanced in value, to demand in a court of equity that she should be now required to convey said property and specifically perform said contract.
Then she sets out the correspondence between herself and the complainants, and alleges that they never procured a report that the title was imperfect from the title company.
Before examining the evidence, I would remark, that the bill seems to proceed upon one erroneous assumption of law, and that is, that the defendant, by virtue of this contract, was under a legal obligation to correct any defects in her title, and that the complainants had a right to claim damages from her for not doing so. We do not understand that to be the " effect of a sale at common law. In the ordinary sale of land, there is no such thing as an implied covenant of warranty, so that if the title proves defective the purchaser can recover damages as for a breach of warranty. There is, it is true, an implied condition in such sale, that the title shall be good; otherwise, the buyer may simply decline to take it and may recover his deposit if he has made one; and that is the whole consequence of the defect in the title. So that all the allegations in the bill as ground for a claim for damages, for not perfecting the title, may be eliminated from the case.
Proceeding .to the evidence: According to local usage, the complainants employed the Real Rstate Title Insurance Company to investigate the title, as it is the right of the purchaser to alwajrs have that done by his own counsel, and Mr. Ridout, *520 who was the vice-president of that company, at the time, proceeded to examine that property. He discovered various imperfections in the title and brought them to the notice of the defendant’s attorney; and the latter, in turn, employed the title company to cure the supposed defects. By the middle of December, most of the apparent defects were corrected by deeds which remained in the possession of the title company, and in the month of March following, all these supposed defects were corrected by the deeds that were in the hands of the title company, and ready to be recorded at any moment. But on the 15th day of December, 1887, Presbrey & Green addressed this letter to Mrs. Baker as the agent of the owner.
“Mrs. May Cole Baker,
“ Agent of Miss Effie H. Obér.
“Madame: In the matter of the contract with you under date of June 1st, 1887, with reference to the sale to us of the tract of land known as 1 Cliff bourne ’ we hereby notify you that we demand the return of our deposit of five thousand dollars, and that we will not comply with the terms of that contract, the same having been annulled by the failure on j^our part to perform the conditions stipulated therein.
(Signed) “Presbrey & Green.”
Then on the 24th of the same month another letter was addressed from the same to the same, as follows:
‘ ‘ On the 15th instant we addressed and delivered to you a notice of our demand for a return of the five thousand dollars deposited with you for the sale to us of the tract of land known as ‘ Cliff bourne ’ which contract provided for the performance on your part of certain conditions which you did not perform. We have no reply from you to that notice, and we now call your attention to it, and demand that you will at once return to us the said deposit, otherwise we shall institute proceedings to recover the same.
“Your immediate attention is called to this matter.
(Signed) • “Presbrey & Green.”
*521 Then on-the nth of February, 1888, another letter was addressed to Mrs. Baker as the agent of the owner, as follows:
“Mrs. May Cole Baker,
“Agent of Miss Filie H. Ober:
“We have to call your attention to our notice of December 15, 1887, in which we demanded the return to us of the deposit under contract of June 1st, 1887, and to say that we cannot any longer allow you to delay compliance with that demand without taking legal steps in the matter. Will you please notify us at once what time we will hear from you.
(Signed) “ Presbrey & Green.”
Then on the 15th of March, 1888, another letter was received by Mrs. Baker, from Mr. Otis F. Presbrey for Presbrey & Green, as follows:
“Mrs. May Cole Baker:
' “As per agreement I send you the certificate in relation to defects in title to Cliff bourne as of date of the 15th when we gave you notice to refund five thousand dollars deposited.
‘ ‘ Otis F. Presbrey,
“For Presbrey & Green.”
Now it is necessary to explain what the evidence shows as to the certificate mentioned in this letter of March 15. The report upon this title was prepared and issued from the office of the title company in March, 1888, and that report set out the conveyances of record, as of the 15th day of December, 1887, and appended to it and constituting the last two pages of it was a list of the supposed defects in the title made out by Mr. Ridout. The paper sent by Presbrey to Mrs. Baker was simply the last two pages of this report, being Mr. Rid-out’s memorandum of these defects. It did not purport to give the position of the title at that time. It was nothing but the memorandum of the defects in the title, as of December 15, 1887, all of which had, in the meanwhile, been cured by those deeds in the possession of the title company. That letter Mrs. Baker replies to as follows:
*522 March 16, 1888.
“Mr. Otis F. Presbrey.
“Dear Sir: — Yours of the 15th instant is received enclosing copy of certificate as to alleged defects in title to ClifFbourne, signed John Ridout, under date of December 15, 1887. The contract, I believe, called for a report of the Real Estate and Ins. Company, and from facts within my knowledge it cannot make any such report as that in the copy you enclosed.”
The explanation of this statement of Mrs. Baker’s that the Title Company “cannot make any such report as that in the copy you enclosed,” grows out of the fact that from her knowledge all of those defects had been cured, and therefore she states that 'fromfacts within her knowledge it (the Title Company) cannot make any such report.
On the 15th of March, 1888, Mr. B. F. Leighton, the attorney for Presbrey & Green, wrote Mrs. Baker as follows:
“ Messrs. Presbrey and Green have placed in my hands the receipt for $5,000 given and signed by you as the duly authorized agent of Fffie H. Ober, bearing date June 1st, 1887, being a deposit on account of the purchase of ClifFbourne, situate in the county of Washington, District of Columbia, and containing the memoranda of an agreement made b3r you on behalf of the said Fffie H. Ober for the sale of the said tract of land.
“One of the stipulations of the contract was that the title to said real estate was to be perfect and satisfactory to the Title Insurance Company of said District, with the provision that if the said Title Insurance Company should report the title to be bad, that then the said sum of $5,000 deposited on account of said purchase aforesaid should be returned to them.
“The report of said company on said title is before me and shows serious defects therein, and the said sum of $5,000 is therefore, by the terms of said contract.to be returned to said Presbrey and Green, and I hereby, on their behalf, make demand for the same of you as the agent of the said Fffie H. Ober. Hoping to hear from you without delay, I remain,” etc.
*523 This letter Mrs. Baker replied to on the 19th of March, 1888, four days afterwards, as follows: '
“Yours of the 15th instant is received relative to Cliffbourne. I would like to see the report of the Real Estate Title Ins. Company, to which you refer, as I was not aware it had reported.
“May Cole Baker.”
Mrs. Baker testifies that no further communication passed-between the parties, but the answer to her application to see the report of the Title Company was a suit brought by the complainants for the recovery of the $5,000, and nothing else passed between the parties until November 30, 1889, twenty months afterwards, when this bill was filed. Meanwhile the defendant, through her agent, employed the Real Estate Title Company to examine the title on her own account, — I presume with reference to the new sale alleged in her answer. The company reported the title to be good, as it stood twenty months before, in March, 1888, the several deeds, which had been obtained and which were in the possession of the title company having been recorded in the office of the Recorder of Deeds.
Now, one of the contentions on the part of the complainants seems to be, that inasmuch as the defendant failed to pay back the $5,000 deposit, the complainants had a right to fall back upon the contract of sale, and insist upon its specific performance.
The case of Barry vs. Coombe, 1st Peters, 640, was relied on in this connection.
In that case, it appeared that Barry was indebted to Coombe to the amount of over $9,000, and Coombe agreed to purchase certain real estate from Barry at about $7,500 and credit it on his account. An account was stated between the parties, in which this credit was given. But"'Barry failed to convey, and Coombe wrote to him, saying:
“It is now time that I should have your final answer, whether you will execute the contract made between us, for the conveyance of your moiety of the house, &c. * * * I *524 must notify you, that if you persist in refusing to comply with the terms of your contract, * * * I shall hol'd you accountable in money, for the whole balance due me according to our settlement, and shall merely hold the house, &c.r which you were to have conveyed to me, as collateral security for the entire balance ascertained by that settlement, &c. ’ ’
Coombe having filed a bill for a specific performance of the 'contract of sale, Barry claimed that the above letter was an abandonment of that contract and that Coombe thereby signified his intention to fall back on his original claim of indebtedness. The Supreme Court said:
“Nothing but the equivocal conduct of Barry, on the receipt of that letter, * * * deprives him of the benefit of this defence. To have availed himself of it, he should have adopted the alternative offered him; and as the only un-’ 'equivocal proof of it, should have tendered to Coombe the amount justly due him, after extracting that item from the account. This he did not do, and it was too, late, after the bill filed, to claim the benefit of a right thus gone by, at least without paying unto Coombe the amount which would have been due to Coombe upon a mutual relinquishment of the bargain.”
If, in this case, these complainants had said to the defendant, “either convey that land to us or pay back that $5,000,” and she had remained silent, then the court might well say that the complainants might withdraw that offer, and still assert title to the land. But this was not so. Nothing could be stronger than their language. They did not say “Give us the land or our money,” but they said “We demand the deposit, and we will not comply with the terms of the contract. ’ ’ It was an abandonment of the sale. Now, either they had a right to do that, on account of the condition of the title, or they had not. Let us assume, in the first place, that they had the right, what was it necessary for them to do in order to abandon or rescind the sale? Nothing was necessary but to declare so, and certainly they have done that as effectually as any language could do it. Nothing was necessary on the defendant’s part. They did abandon or rescind the sale, *525 and what was the effect of that, assuming now that it was a legal step on their part? The effect was that the sale ceased to exist. The land remained the property of Mrs. Kline, and they had only a demand for the return of the $5,000. The ■contract could not be resuscitated by one of the parties without the consent of the other. The complainants could not say, because they failed to recover their mo,ney, or because she refused, rightly or wrongly, to pay back to them their money, that they would revive the contract, which was put an end to. It is perfectly plain, therefore, that the acts of the complainants, if they had a right to withdraw from the sale, had effectually destroyed and put an end to the contract of sale. The plain common sense of this matter is expressed in one of the cases cited in argument, the case of Herrington vs. Hubbard, 33 Am. Dec., 437, where, after the sale was made in this way, the purchaser sued for the recovery of the deposit money, and afterwards filed a bill for a specific performance. Meanwhile, the owner had sold to another person.
The court said: “He (Hubbard) first institutes his action of covenant to recover damages for the non-performance by Herrington of his portion of the agreement, and afterwards brings his action to recover back the consideration paid. We think this is sufficient evidence of his determination to treat the contract as rescinded, and that it is eqidvalent to an express disaffirmance of it, which must be the legal intendment of his act; for he certainly could not recover back the consideration money paid, but on the ground of a disaffirmance. Herring-ton then had a right so to consider it, and was at liberty to treat and enter into a contract with Wright for a sale of the lands to him. * * * The doctrine of concurrent remedies is not disputed, but he surely could not proceed to recover back, in an action at law, the consideration money paid, which must be based on an actual or constructive disaffirmance of the contract: and also obtain a decree for the specific execution of a contract pronounced by a judgment at law disaffirmed.”
Now, that is exactly what was done in the present case. The complainants brought their suit for the deposit money on the ground that the title was defective, thereby repudiating *526 the contract, and while that suit is pending, (and it is still pending) they bring this suit for the specific performance of the contract. The two remedies are absolutely inconsistent.
Now, then, suppose, on the other hand, that the complainants were not justified in refusing to complete this contract of purchase on the ground of the imperfections of the title. Bven here it is argued ingeniously that the complainants have a right to the relief sought.
The argument seems to fail in not discriminating between the rights of a party in fault and a party not in fault. It seems to be this: one party cannot put an end to a contract without the consent of the other. Although these complainants notified Mrs. Kline that they would not perform the contract, she did not consent to release them and the contract remained in force, and the contract not being at an end, they had still a right to change their minds and claim its specific execution.
On page 10 of the brief, it is said, “the acceptance of one party is, however, as essential and indispensable to the rescission of the contract as the absolute refusal of the other to perform, and no abandonment results until there has been a clear and unambiguous acceptance by that other party.” They recite also; Fry on Specific Performance, “Where one party to a contract absolutely refuses to perform his part of the contract, either before or after the hour for performing has arrived, the other party may accept that refusal, and thereupon rescind the contract.” Now it is true that one party cannot rescind the contract without the consent of the other, but that rule is for the benefit of the injured party and not of the other. Would it not be absurd for a party to come into a court of equity and say, ‘ ‘It is true that I did not perform my contract, and absolutely refused to do it, but now I have changed my mind. I find it now for my benefit to enforce the contract.”? We say that would seem to be-absurd. It is elementary law that a party must show that he has always been ready and willing to perform his part of the contract and has made demand upon the other party to perform. What are the facts in this case? The defects were cured in March, 1887, *527 and all the deeds curing those alleged defects were procured and delivered to Mr. Ridout, except one or two and they were to be procured in a few days, of which Mrs. Baker testifies that she notified Mr. Ridout before the notice of this suit was brought to her. The title company was the agent of the complainants up to the time, at least, of their report upon the title in March, 1888, and they had notice, and that was notice to their principals, the complainants. They had constructive notice, and we are also satisfied that they had actual notice, at that time, that the supposed defects in this title had been cured or would speedily be cured. That was the time when the complainants were bound to tender their performance. Four, I think, of the installments of purchase money were overdue at that time, but, as we have already seen, not only they did not tender performance, but they absolutely refused to perform. No other communications passed between these parties until the bill was filed. The complainants never offered to perform, and, what is more remarkable, the bill itself does not do so in any proper sense.
They offer to perform in terms which amount to nothing more than a conditional offer. They say, ‘ ‘The complainants ask that the contract may be specifically performed by the defendant, the complainants being willing and now here offering to perform the same so far as it remains on their part to be performed, and that the said defendant be decreed to convey by a good and stiff dent deed a good and valid title in fee simple to all of the said premises, free and discharged of all taxes, liens and imperfections in said title, except only the said deed of trust for $40,000, which they are willing to assume, and that the said defendant be required on her part to cause the said imperfections in said title to be removed; ” which is equivalent to saying, “We offer to pay the money provided the court will compel the defendant to perfect her title,” which the complainants have no power to insist upon, nor the court the power to compel. The only proper offer of performance would be an unconditional offer to take the property and pay the money. And where, as in this case, the complainants do not seem to have ever offered to perform their *528 part of the contract, it would seem preposterous for them to ask the powers of this court to be exercised to compel the defendant to perform.
The case of Brashier vs. Gratz, 6 Wheat., 529, is quite pertinent here. One Brashier had purchased certain land of Gratz, but had simply failed to pay the purchase money, without repudiating his purchase. Gratz several times offered to convey upon receipt of the money due. About two years after the last offer the land suddenly rose in value from the agreed price of $22.50 to $80 per acre. Then Brashier filed his bill for specific performance against the heirs of Gratz, who had meanwhile died.
The Supreme Court said: “This then is a demand for a specific performance, after a considerable lapse of time, made by a person who has failed totally to perform his part of the contract; and it is made after a great change, both in the title and in the value, of that which was the subject of the contract, and by a person who could not have been compelled to execute his part of it, had circumstances taken an unfavorable direction. In such a case, we are of opinion that a court of equity ought to leave the parties to their remedy at law.”
Here, too, the application is made after a change both in the title and the value; ana here, too, the contract could not have been enforced against the complainants, because they had not signed any written memorandum of it. But we have the additional circumstance that they had distinctly repudiated the contract.
There are one or two other matters which I omitted to notice. There was a suggestion that the title was not made good because the deeds curing the defects were not placed on record, and the report from the title company was confined tó the title as it then appeared of record. Now, these deeds were put in the hands of the title company, for the purpose of being recorded, and could have been recorded at any moment. The refusal or omission of the defendant to carry through this contract was, as I may so express it, aggravated *529 on the part of the complainants, by their getting the certificate of the title which was dated so as to present simply the title of three months before, and ignoring entirely the deeds which cured the defects, and which were then in the hands of the title company, the agent of the complainants. It only shows a more resolute determination on the part of the complainants not to comply with the terms of sale. There could not be a more emphatic refusal. Whether they had a right to rescind the sale or not, then, it seems plain that they had no right to ask specific performance in either case, and a decree for specific performance, in their favor, therefore, is out of the question. There is only one question remaining. By the terms of this contract, as already shown, if the Real Estate Title Company should report the title as imperfect, the $5,000 were to be returned to said Presbrey & Green, otherwise to be forfeited, if the terms of the contract were not complied with. If the Real Estate Title Company did make such report as this contract required, then these complainants have a right to have the $5,000 returned to them. If they did not make such a report, then the complainants have not any right either at law or in equity to have the money returned to them. A suit is now pending to determine that question, and it is a question proper to be determined in a court of law. The claim for the $5,000 alone is no ground for the interference of a court of equity, and all that we can do is to leave the parties where they are now, and affirm, the decree of the Special Term, dismissing the bill, and leaving the complainants to prosecute their action at law. .